GEORGE GIBSON, PLAINTIFF-RESPONDENT, v. GERARD KENNEDY, DEFENDANT, AND PENNSYLVANIA RAILROAD COMPANY, A CORPORATION OF PENNSYLVANIA, DEFENDANT-APPELLANT.

Argued November 26, December 3, 1956—Decided January 14, 1957.

152

Mr. *Stephen VR. Strong* argued the cause for appellant (Messrs. *Strong and Strong,* attorneys; *Mr. Stephen VR. Strong,* of counsel).

Mr. *John J. Rafferty* argued the cause for respondent (Messrs. *Rafferty and Blacher,* attorneys; *Mr. Philip Blacher,* of counsel).

The opinion of the court was delivered by

WEINTRAUB, J. Defendant, Pennsylvania Railroad Company, appealed to the Appellate Division from a judgment against it in the sum of $25,000 entered upon a jury verdict. We certified the appeal on our own motion. The judgment also ran against defendant's employee, Kennedy, who, however, did not appeal.

The action with respect to the railroad was grounded upon the Federal Employers' Liability Act, 45 *U. S. C. A., sec.* 51, which provides that a railroad engaged in interstate commerce shall be liable for injury to or death of its employees "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."

The litigation arose out of an assault and battery by Kennedy upon plaintiff. The complaint pursued two theories. One was that defendant continued to employ Kennedy despite knowledge of his dangerous character. The trial court resolved this charge in defendant's favor at the close of plaintiff's case. The other approach, upon which plaintiff prevailed, was that Kennedy's conduct constituted negligence for which defendant was chargeable under *respondeat superior.*

 As the statute has been construed, with binding effect upon us, *Urie v. Thompson,* 337 *U. S.* 163, 69 *S. Ct.* 1018, 93 *L. Ed.* 1282 (1949), "negligence" embraces an assault and battery, and the employer must respond if it was committed by an employee in the scope of his employment with the purpose of furthering the employer's business. *Jamison v. Encarnacion,* 281 *U. S.* 635, 50 *S. Ct.* 440, 74 *L. Ed.* 1082 (1930); *Alpha Steamship Corp. v. Cain,* 281 *U. S.* 642, 50 *S. Ct.* 443, 74 *L. Ed.* 1086 (1930); *Nelson v. American-West African Line, Inc.,* 86 *F.* 2d 730 (2d *Cir.* 1936), *certiorari* denied 300 *U. S.* 665, 57 *S. Ct.* 509, 81 *L. Ed.* 873 (1937); *Smith v. Lehigh Valley R. Co.,* 174 *F.* 2d 592 (2d *Cir.* 1949); *Jester v. Southern Ry. Co.,* 204 *S. C.* 395, 29 *S. E.* 2d 768, 156 *A. L. R.* 632 (*Sup. Ct.* 1944), *certiorari* denied 323 *U. S.* 716, 65 *S. Ct.* 44, 89 *L. Ed.* 576 (1944); *Annotation,* 33 *A. L. R.* 2d 1295 (1954).

## I.

 Defendant urges it was error to send the case to the jury and to deny a motion for a new trial.

Defendant insists the testimony will reasonably admit of the single conclusion that Kennedy's attack was motivated solely by personal animosity and hence defendant should not be held. *Davis v. Green,* 260 *U. S.* 349, 43 *S. Ct.* 123, 67 *L. Ed.* 299 (1922). In our view, however, the evidence abundantly supports a finding that Kennedy committed the tort in the discharge of his duties and with the purpose of furthering his employer's business under orders as he understood them, albeit that this purpose may have been concurrently attended by a desire to retaliate for personal pique.

The attack occurred on November 4, 1953. On that day, Kennedy was a passenger conductor in charge of a train travelling from New York City to Trenton, N. J., with instructions, as he testified, to proceed "deadhead" from New Brunswick to Trenton. He understood defendant's regulation to mean that all passengers had to alight at New Brunswick, and that employees of the road likewise had to leave

at that stop unless expressly authorized to proceed "deadhead" beyond that point. As indicative of his understanding of the regulation, Kennedy said he directed a member of his crew whose duty ended at New Brunswick to leave the train at that station, notwithstanding the employee lived in Trenton.

Plaintiff had boarded the train at Elizabeth as a special duty conductor under orders from the trainmaster, who had overall charge, to observe for violations of regulations. Plaintiff, in fact, was authorized to continue to Trenton. Kennedy, however, testified he knew plaintiff as a passenger conductor, although he also knew plaintiff at times served as the trainmaster's representative. According to plaintiff, he did serve as a passenger conductor at times, although his role as special duty conductor was the usual one. Plaintiff recalled only three prior occasions when he served as a special duty conductor on a train on which Kennedy worked and one occasion when he and Kennedy worked together as conductors.

Plaintiff said that when the train reached New Brunswick Kennedy announced "all passengers off, New Brunswick is the last stop," and asked plaintiff where he was going, to which plaintiff replied that he represented the trainmaster and had orders to go to Trenton on that train, and on demand exhibited his transportation pass; that Kennedy said the pass did not evidence the claimed authorization and insisted plaintiff get off, to which plaintiff asserted his intent to remain. Kennedy's version was quite different and was supported by members of his crew, Grady and Saams. Kennedy denied plaintiff revealed he was riding as the trainmaster's representative or showed any pass, and said that when he asked plaintiff to leave he "replied to me in an abusive tone that I was 'To get the hell out of there' and mind my own business." Kennedy added that if plaintiff had claimed he was authorized to remain, he would have accepted his statement.

Kennedy said the situation in which a passenger refused to leave at the last stop had never before confronted him. He left the train and inquired of the ticket agent, Hayes,

whether a railroad policeman was available, and was told that none was and that the New Brunswick police would not act except upon a complaint, which Kennedy did not wish to make, since "I wasn't looking to have anybody arrested. I merely wanted someone off my train."

Meantime, plaintiff alighted from the train to ascertain the reason for the delay and met Kennedy returning from the ticket agent's office. The testimony again diverges. Plaintiff said he asked Kennedy what the delay was and Kennedy replied, "You are the delay to the train," and that the train would proceed but "you are not going to go"; that he followed Kennedy for some 35 to 40 feet, walking on his left, "when suddenly Kennedy turned around and swung his lantern and hit me in the eye and the side of the face"; that he was dazed and attempted to follow Kennedy into the train but as he mounted the first step Kennedy, then on the platform of the train, again struck him with the lantern, rendering him unconscious. Kennedy, on the other hand, testified that when he passed plaintiff on the railroad platform, plaintiff asked if the train was going to leave and he answered that it was; that he walked past plaintiff and proceeded about 100 feet and signaled for the train to move; that as he attempted to board the train plaintiff struck him without warning, "attempting then to continue to force his way onto the train"; that he, Kennedy, defending himself, lashed out with both fists, but did not strike plaintiff with the lantern. There was other testimony supporting Kennedy's claim of an injury to his left cheek, but his disclaimer of the use of the lantern was not believable in the absence of some other explanation of the severe injuries to plaintiff, and no other specific explanation was offered.

The jurors were not bound to accept all of the testimony of any witness, but rather could accept such portions as they deemed worthy of belief. The foregoing resume easily reveals a sufficient basis for a finding that Kennedy, who was in charge of the train, acted in the scope of his employment, and that with the purpose of furthering defendant's business and its regulation against riding "deadhead," he

sought to prevent a person he believed to be unauthorized from boarding the train.

Defendant's insistence that the motivation was solely personal rests upon these circumstances. About 15 months before the event here involved, plaintiff testified in a disciplinary proceeding against Kennedy with respect to a complaint which, however, plaintiff had not advanced. Further, two days before the event here involved, plaintiff observed Saams, a member of Kennedy's crew, smoking a cigarette at the Pennsylvania station and either told Saams to put out the cigarette or to assist the passengers. On that occasion, Kennedy asked plaintiff to report to him any complaints relating to his crew. Both plaintiff and Kennedy disclaimed any ill feeling as the result of either affair and both deemed their relations to be friendly, plaintiff adding, "he was very cooperative with me, I had no trouble with Mr. Kennedy." Stress is also placed on the testimony of the ticket agent, Hayes, that when he asked Kennedy who the recalcitrant passenger was, Kennedy replied that he did not know. But the jury was free to accept Kennedy's testimony that Hayes never put that question and that there was no occasion in the conversation for Kennedy to identify the passenger. Lastly, defendant points out that Kennedy could have used the telephone at the station to seek further instructions from a superior, but did not.

Although the jury could have concluded from these circumstances, coupled with the severity of the attack, that Kennedy harbored a grievance and sought to satisfy it, yet the jury with equal justification could have found private motive played no role at all, or in any event, although concurring, did not exclude the purpose to further defendant's business. *Restatement, Agency, sec.* 236 (1933). As said in *Nelson v. American-West African Line, Inc., supra* (86 *F. 2d,* at *page* 731), "motives may be mixed; men may vent their spleen upon others and yet mean to further their master's business; that meaning, that intention is the test."

Nor can liability turn upon whether the means used by Kennedy were appropriate or prudent or exceeded the

needs of the occasion or the authority conferred. *Jamison v. Encarnacion, supra* (281 *U. S.,* at *page* 641, 50 *S. Ct.,* at *page* 442). Assaults and batteries rarely, if ever, redound to the economic advantage of the employer, and it may readily be assumed the employer would not wish them. The outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal, *Restatement, Agency, sec.* 235, *comment* (*c*) (1933), but if the employee is within the scope of employment and intends to further the employer's business, the employer is chargeable even though the employee's conduct be "imbecilic." *Nelson v. American-West African Line, Inc., supra* (86 *F.* 2*d,* at *page* 732).

Defendant contends it should not be held for an attack by an employee upon one who is superior in authority. The factual premise for this contention is plaintiff's testimony that as the trainmaster's representative he had authority to issue orders to Kennedy. The legal support is sought to be found in the circumstance that in the reported cases in which an employee prevailed, the assailant was the superior. See 33 *A. L. R.* 2*d,* at *page* 1303 (1954).

But none of the decisions there assembled suggests the employer is liable only if the attacker had the right to direct, or that the victim is barred merely because his authority was the greater. Ordinarily the fact that the assailant had authority to direct is evidential of the crucial fact that he acted within the scope of employment and sought to further the employer's business, and so, also, if the employee attacked one he knew to be his superior in response to an order within the superior's authority, it may readily be found that the assailant neither pursued his duties nor intended to further the business which engaged him. But the final criterion is whether the offending employee was within his employment and did seek to further it. And where, as here, the jury could find that Kennedy was in immediate charge of the train, was unaware of plaintiff's superior position, and hence believed he had the final say and plaintiff had none at all, and intended to further de-

fendant's business by securing compliance with its regulation that an unauthorized person shall not ride "deadhead," every reason exists for the application of *respondeat superior*.

We accordingly are satisfied the trial judge correctly denied defendant's motion for judgment and with equal propriety the motion for a new trial. *Tennant v. Peoria & P. U. Ry. Co.*, 321 *U. S.* 29, 64 *S. Ct.* 409, 88 *L. Ed.* 520 (1944); *Wilkerson v. McCarthy*, 336 *U. S.* 53, 69 *S. Ct.* 413, 93 *L. Ed.* 497 (1949).

## II.

Defendant asserts the court charged as a matter of law that the jury should infer Kennedy acted within the scope of his employment and furthered defendant's business in preventing plaintiff from riding the train. A fair reading of the charge does not support the objection. The passage complained of was merely a statement of plaintiff's contention. The trial court charged the principles controlling liability with complete clarity. There was no room for misunderstanding.

## III.

It is next complained the trial court erred in charging that if it should be found that plaintiff was the aggressor, as Kennedy contended, defendant might be held if the force used was excessive.

Defendant says neither the complaint nor the pretrial order embraced this issue. The complaint did not anticipate Kennedy's claim of self-defense. In the pretrial order Kennedy asserted self-defense and the statement of issues included it.

The defense of self-defense necessarily raised the further issue of excessive force. We see no reason why plaintiff should be foreclosed by reason of a failure to flag the obvious. Nor is it of moment that defendant did not join in the separate defense asserted by Kennedy. It surely cannot complain that it was permitted to have the benefit of it.

It is not clear whether defendant also contends that as a matter of substantive law it cannot be held for the use

of excessive force by its employee. No reason is suggested, and none occurs to us, why liability should be denied if in addition to finding that excessive force was used the jury also found, as the charge required, that Kennedy was acting in the scope of his employment and with the purpose of furthering defendant's business.

## IV.

■ It is urged the amount of verdict is so excessive that it clearly and convincingly appears it was the result of mistake, partiality, prejudice or passion and hence the trial court erred in denying the motion for a new trial. *R. R.* 4:61–1.

Defendant paid the medical, surgical and hospital bills and plaintiff suffered no loss of pay. But the injuries were severe. The jury could have found plaintiff was unconscious for some 11 hours; was hospitalized for 25 days and unable to resume work for five months; that he suffered severe head injury, including a fracture of the skull, some irreversible brain damage, and the development of a blood clot which required surgery; severe lacerations of the scalp; loss of sense of smell; loss of sex drive; impairment of memory and ability to concentrate; some disturbance of visual powers; nervousness, irritability, headaches, earaches, impairment of the ability to sleep; and, of course, the suffering which accompanied those injuries. We cannot say the sum of $25,000 is immoderate, and surely cannot quarrel with the trial court's determination that the amount does not evidence mistake, partiality, prejudice or passion.

## V.

■ It is urged that the witness, Kelly, was permitted to testify in violation of *R. R.* 4:23–12, in that he had not been named in answer to an interrogatory. The interrogatory and answer are not printed in the record, but do appear in plaintiff's brief without challenge by defendant. It is doubtful that the question propounded called for the dis-

closure of Kelly. Moreover, we should not lightly disturb a trial judge's exercise of discretion in such matters. At any rate, defendant received about 24 hours' notice that Kelly would testify. His testimony was addressed to some prior event in an effort to prove that Kennedy was a turbulent person to defendant's knowledge. The proof on that issue was later held inadequate as a matter of law and accordingly was not submitted to the jury. Hence there could have been no prejudice in any event.

## VI.

Lastly, it is charged that Dr. Culberson was permitted to testify in violation of *R. R.* 4:25-2.

██ Dr. Culberson was associated with Dr. Fitch in the care of plaintiff. When medical reports were demanded under the rule, Dr. Fitch's was furnished. No report had been made by Dr. Culberson. Plaintiff had not intended to call him, but found it necessary to do so because Dr. Fitch was unable to appear by reason of the press of other matters.

When Dr. Culberson's testimony allegedly departed from Dr. Fitch's report, the controversy arose. The trial court directed Dr. Culberson to withdraw and prepare and submit a written report. This was done, and Dr. Culberson resumed the stand the following day. Dr. Fitch's report was admitted into evidence by consent.

The cited rule provides in part that "If a physician fails or refuses to make a report on the request of the party examined, the court may exclude the physician's testimony if offered at trial." The rule commits the matter to the trial court's discretion. His handling of the problem appears to us to be unexceptionable.

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and WEINTRAUB—6.

*For reversal*—Justice OLIPHANT—1.