NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3017-11T1

KHASHAYAR VOSOUGH, M.D., an
individual, CHARLES G. HADDAD,
M.D., an individual, MAHIPA
PALLIMULLA, M.D., an individual,
and COMPREHENSIVE WOMEN'S
HEALTHCARE, P.C., a corporation
of the State of New Jersey,

     Plaintiffs-Respondents/
     Cross-Appellants,

v.

ROGER KIERCE, M.D., an individual,
WILLIAM A. MCDONALD, an individual,
ST. JOSEPH'S REGIONAL MEDICAL CENTER,
a New Jersey non-profit corporation,

     Defendants-Appellants/
     Cross-Respondents,

and

MARIAN H. SPEID, ESQ., an individual,

     Defendant.

|  APPROVED FOR PUBLICATION  |
| :---: |
|  **August 27, 2014**  |
|  **APPELLATE DIVISION**  |

_____

Argued May 12, 2014 — Decided August 27, 2014

Before Judges Yannotti, Ashrafi, and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket No.
L-6420-09.

Lance J. Kalik argued the cause for appellants/cross-respondents Roger Kierce, M.D., and William A. McDonald (Riker Danzig Scherer Hyland & Perretti, L.L.P., attorneys; Mr. Kalik, of counsel and on the joint brief; Tracey K. Wishert and John Atkin, on the joint brief).

Thomas E. Hastings argued the cause for appellant/cross-respondent St. Joseph's Regional Medical Center (Smith, Stratton, Wise, Heher & Brennan, L.L.P., attorneys; Mr. Hastings, of counsel and on the joint brief; Kimberly M. Parson, on the joint brief).

Barry D. Epstein argued the cause for respondents/cross-appellants (The Epstein Law Firm, P.A., attorneys; Mr. Epstein, of counsel and on the brief; George B. Forbes and Michael A. Rabasca, on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

In this lawsuit for breach of contract and tortious interference with contract and economic advantage, plaintiffs are three doctors specializing in obstetrics and gynecology, Khashayar Vosough, M.D., Charles G. Haddad, M.D., and Mahipa Pallimulla, M.D., and also their medical practice, Comprehensive Women's Healthcare, P.C. ("CWH" or "CWHC"). Defendants are St. Joseph's Regional Medical Center located in Paterson, its chief executive officer, William A. McDonald, and the chairman of its department of obstetrics and gynecology, Roger Kierce, M.D.

After a sixteen-day trial, defendants appeal from the jury's verdict awarding $423,026.33 against each of the three defendants, totaling $1,269,079. Plaintiffs cross-appeal from exclusion of their expert testimony alleging a higher amount of future anticipated losses, and the trial court's denial of their claims for punitive damages and prejudgment interest. We reverse the judgment and dismiss the cross-appeal.

I.

Plaintiffs filed a four-count complaint in 2009 alleging breach of contract by the hospital, tortious interference with contract and with prospective economic advantage by the individual defendants, and respondeat superior liability of the hospital for the negligent conduct of the individual defendants.[1] The negligence allegations did not survive the trial and are not an issue on appeal.[2] The jury awarded damages against the hospital for breach of contract and against the individual defendants for the tortious interference counts of plaintiffs' complaint.

---

[1] "Respondeat superior liability" means "vicarious liability" for the wrongful conduct of an employee or agent. See Davis v. Devereux Foundation, 209 N.J. 269, 287 n.2 (2012).

[2] The trial court also dismissed plaintiffs' claims against a third individual defendant, Marian Speid, who was legal counsel to the hospital.

To summarize plaintiffs' lawsuit, we quote directly from the preliminary statement in their brief on this appeal:

> This appeal and cross-appeal follow a verdict in favor of a medical group CWH and its shareholders against a defendant hospital and two of its executive officers arising out [of] intolerable situations and intimidation which forced the group and its doctors to resign lucrative independent contractor agreements ("ICAs") and ultimately their staff privileges thereby causing substantial financial losses.
>
> The initial reason for defendants' coordinated effort of harassment was alleged untruthful testimony that one member of CWH gave during a deposition concerning the hospital's OB/GYN department policy. St. Joseph's Regional Medical Center's officials reacted negatively to this testimony and retaliated against [CWH] in response, eventually forcing plaintiffs to resign their independent contractor agreements. The main aggressor against plaintiffs was defendant Roger Kierce, M.D. Kierce is the head of St. Joseph's OB/GYN department, and was plaintiffs' direct supervisor. To this end, Kierce engaged in a course of conduct that included but was not limited to humiliating Dr. Khashayar Vosough in front of colleagues by asserting that he committed the crime of perjury, threatening plaintiffs' position with the hospital by stating that he was going to "rip their skulls from their skeletons and keep a head count" if they failed to attend a department meeting, even though no attending physician had ever been disciplined for missing a department meeting, and threatening plaintiffs that he would fire them from their positions at St. Mary's hospital once St. Joseph's and St. Mary's merged.

4

To stop Kierce's abuse, plaintiffs invoked their rights and sought the protection of St. Joseph's CEO, William McDonald pursuant to the hospital bylaws. However, McDonald did not consider Kierce's abuse to be a serious issue, and failed to perform any meaningful investigation into plaintiffs' complaints. In fact, McDonald considered Kierce's statements to be little more than jokes. Realizing that there would be no relief from Kierce's abusive behavior, plaintiffs were forced to tender their hospital privilege resignations, and suffer the losses alleged.

Describing the case thus in the best light from plaintiffs' point of view, plaintiffs allege they were constructively discharged and were entitled to compensation because of harassment, abuse, and retaliation by their supervisor at the hospital and failure of the hospital's CEO to stop that wrongful conduct.

It is important to keep in mind that plaintiffs did not and could not allege constructive discharge resulting from unlawful discrimination or from any conduct of plaintiffs that was protected by law or a clear mandate of public policy. Plaintiffs' claims of a hostile work environment and retaliation are not a cause of action under New Jersey's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49; under a constitutional provision or any federal statute prohibiting discrimination; under New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8; or under Pierce

v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980), the common law antecedent of CEPA.  This case is simply a common law contract and tort case.

When considering defendants' several pretrial and trial motions seeking judgment in their favor, the trial court should have viewed with more circumspection the tenuous nature of plaintiffs' allegations in a common law contract and tort case. Our common law recognizes no cause of action for a hostile work environment simply because an employee is mistreated by a nasty boss.  The common law does not protect employees generally against an unpleasant work environment, or the failure of the employer to address incivility in the workplace.  Cf. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201, 207 (1998) (Title VII, 42 U.S.C. § 2000e, prohibits workplace harassment only if members of a protected class are treated differently from non-members).

With respect to St. Joseph's hospital, plaintiffs' claim was viable only if they could prove breach of contract and damages caused by that breach.  Furthermore, since their contracts were with the hospital and not with the individual defendants, their claims against McDonald and Kierce could be maintained only if plaintiffs could prove that the conduct of the individual defendants that constituted their alleged

tortious interference was outside the scope of their employment with the hospital.

If the individuals were acting outside the scope of their employment, however, then those same acts were not committed on behalf of the hospital, and plaintiffs' breach of contract claim against the hospital was not viable. The same conduct of the individual defendants could not be both breach of contract by their employer and tortious interference by them individually.

In the end, none of plaintiffs' claims should have survived summary judgment or a directed verdict at trial.

## II.

Because we will apply the standard of review applicable to summary judgment, R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), and that applicable to a directed verdict or judgment in favor of defendants at the time of trial, R. 4:37-2(b); R. 4:40-1; R. 4:40-2(b); Verdicchio v. Ricca, 179 N.J. 1, 30 (2004), we will recite favorably to plaintiffs the facts of the case and all reasonable inferences that could be drawn from the evidence. In other words, our recitation of the facts omits defendants' responses and defenses to plaintiffs' allegations and assumes that the jury would or did believe plaintiffs' version of the facts.

Plaintiff doctors, Vosough, Haddad, and Pallimulla, are highly-regarded OB/GYN specialists. They completed their residencies in that field under defendant Kierce at St. Joseph's hospital. After their residencies, plaintiffs formed CWH to practice their specialty, and they had admitting privileges at St. Joseph's and other hospitals in the region.

Each plaintiff had an independent contractor agreement (ICA) with St. Joseph's hospital to be an "attending physician" in the OB/GYN department on a schedule assigned by the hospital. An attending physician supervised residents, fellows, and medical students; provided physician coverage at the hospital for all "unassigned" patients, meaning patients who came to the hospital without their own doctors; and responded immediately to "in-house obstetrical and gynecological emergencies." The ICAs provided that the doctors would be paid $100 an hour by the hospital for their services as attending physicians and they would not bill patients separately for those services.

Plaintiffs' ICAs went into effect on March 1, 2002, and were to continue until terminated in accordance with the terms of the ICA. The ICAs permitted "either party" to terminate the agreement "without cause, reason or justification upon sixty (60) days' prior written notice to the other party," or to

terminate the agreement "immediately upon a material breach of this Agreement by the other party."

Plaintiffs also had staff privileges at St. Joseph's hospital, which means they were permitted to admit their own patients for care at the hospital. They billed separately for their physician services to their own patients. As previously stated, plaintiffs had staff privileges as well at other hospitals in the area.

Kierce was the chairman of the OB/GYN department at St. Joseph's hospital. He had a reputation of striving for an unreasonable level of perfection and being a hard-hearted and belligerent taskmaster. He was inclined to disparage and insult physicians and staff under his supervision. In addition to the three plaintiff doctors, several other doctors testified that Kierce would use profanity and demeaning comments to reprimand physicians and hospital staff, including publicly. Kierce admitted in his testimony that he would use "biting language" and be "harsh" and "stern" in his treatment of doctors and staff under his supervision. He acknowledged he had made "mistakes" but rationalized his lack of professionalism and civility on the ground that he had high expectations "to have perfect outcome with the patients" and would not "tolerate people that do not respect the privilege to take care of patients."

A-3017-11T1

Kierce's conduct violated the Medical Staff Bylaws adopted by St. Joseph's hospital. The bylaws stated that "[i]t is the policy of St. Joseph's Regional Medical Center that all persons within its facilities be treated with courtesy, dignity and respect." The purpose of this policy was "to prevent or eliminate conduct that disrupts operations at [the hospital], affects the ability of others to do their jobs, creates a hostile work environment for employees or other medical staff members or interferes with their ability to work competently." The bylaws described prohibited conduct to include: "[v]erbal or physical attacks, hostility, threats of violence or retaliation . . . [c]riticism addressed to the recipient in such a way as to unreasonably intimidate, undermine confidence, belittle or imply stupidity or incompetence."

The ICAs required that plaintiffs adhere to the bylaws, and plaintiffs expected that other physicians at the hospital would also be required to adhere to the same bylaws. They alleged in their lawsuit that the hospital was impliedly bound by their ICAs to enforce the bylaws and to take action against Kierce's violations. They alleged that the hospital, through McDonald's inaction, breached their ICAs by failing to enforce the bylaws and to discipline Kierce.

A-3017-11T1

Three discrete incidents formed the heart of plaintiffs' case. First, plaintiffs claimed that Kierce publicly accused Vosough at a department staff meeting of committing perjury in deposition testimony he gave in a malpractice lawsuit brought against Vosough and St. Joseph's hospital. In that testimony, Vosough disclaimed responsibility for the patient's condition on the ground that he had not been notified by other staff at the hospital that the patient had been admitted and was in need of his services. He testified there was a "chain of command" at the hospital, like in "an army," and the attending physician, like "a general," could only act on information that those in the chain had provided to him.

Kierce privately told Vosough that he disagreed with Vosough's disclaimer and considered his testimony to be perjury because an attending physician should take responsibility for the treatment of patients during his schedule whether or not he was specifically notified of a patient's need for his services. According to Vosough, at the staff meeting, Kierce gazed straight at him for about five seconds while telling the twelve to fifteen people assembled, "some people perjure themselves on the stand." Vosough considered this perjury comment to be a public accusation against him intended to intimidate him and all the staff in the OB/GYN department. In the same context,

A-3017-11T1

plaintiffs also alleged that Kierce insulted all attending physicians by calling them "vultures."

At the same time as this incident, Kierce announced a new department policy that attending physicians would be responsible for all patients within the scope of their duties, whether or not the attending physician had specific notification of the patient's admission and need for services.  This change in policy was of great concern to plaintiffs, and Vosough voiced his objections to Kierce.  Vosough testified that Kierce responded with a disrespectful comment: "you don't like it, don't let the door hit you — don't let the door slap you in the ass."

In Vosough's opinion, the policy change would cause increased medical malpractice exposure to the point where the doctors would not be able to practice medicine.  Vosough complained to CEO McDonald and to Ed Jimenez, the hospital's director of physician relations, about the change in policy and requested that it be rescinded.  McDonald attempted to allay Vosough's fears, but decided that the new policy would remain unchanged.

On February 25, 2006, plaintiffs gave written notice that they were terminating their ICAs as attending physicians.  Their resignation letter stated:

Dear Dr. Kierce

It has always been an honor and pleasure to work with you.  As our group is expanding and concentrating in the new and exciting field of complete laparascopic minimally invasive surgery as well as robotic surgery, we feel that in order to pursue our goals we no longer can commit to working weekends in St. Joseph's Hospital.

Furthermore with the new changes that were instituted for attending physicians covering house, CWHC feels that we are at grave risk for a malpractice fiasco.  Our insurance carrier has strongly suggested that we no longer cover service calls at St. Joseph's Hospital.  We would like to stop coverage as of March 1, 2006 or April 1, 2006.  We know that there are many physicians who are eager and waiting to take this position.  Thus this seems a great chance to pass the torch to them.  Clearly if there is an emergent need, we may help until you find suitable replacements.  CWHC shall continue to bring private patients to this fine institution as we always have.

According to Vosough's testimony, this letter was not entirely truthful, and the reasons for the resignation were stated in this way so that plaintiffs would remain on good terms with defendants.  He testified that plaintiffs would need future references from Kierce, and they did not wish to cause further animosity.  He claimed that he and the other plaintiffs resigned from their attending physician contracts because of the policy change and because of Kierce's abusive conduct.

A-3017-11T1

Kierce attempted to convince plaintiffs to change their minds about resigning as attending physicians. The second discrete incident occurred when Kierce called them to a meeting and discussed the termination of their ICAs, which were valued at about $700,000 in annual income. When plaintiffs were not persuaded, Kierce became angry and threatened to sever their association with a different hospital, St. Mary's, after its anticipated merger with St. Joseph's hospital. According to Vosough, Kierce said that he had seen plaintiffs' contracts with St. Mary's and that he would change those contracts because St. Mary's overpaid them. Kierce also insulted plaintiffs and said they should be "good little boys" and withdraw their resignations.

Plaintiffs complained again to McDonald and Jimenez about Kierce's threat, but again the hospital executives took no action against Kierce. As it turned out, St. Joseph's did not merge with St. Mary's and Kierce had no influence on plaintiffs' contracts with St. Mary's.

The third incident occurred in May 2006 when plaintiffs were no longer serving as attending physicians. Kierce had scheduled a "Residents Research Day" where department staff, including physicians, were told they must attend a meeting to

14                                                    A-3017-11T1

hear hospital residents make presentations on research projects they had completed. Plaintiffs did not attend the meeting.

In the presence of about twenty people at the meeting, Kierce yelled to Dr. Shihad, who was also associated with CWH, "where are your boys," meaning plaintiffs and other doctors associated with CWH. Kierce then said in a loud voice: "Tell them if they don't attend the meeting, I'm going to rip their skulls from their skeletons and keep a headcount."

Shihad immediately conveyed this message to Vosough, who called Kierce to complain about the threat. Kierce responded that Vosough should calm down because he meant it as a joke. Vosough asked Kierce to assemble the people who heard the remark and tell them publicly that he was joking. Kierce responded, "keep dreaming." Vosough then complained about Kierce's public threat to Jimenez and Dr. Labagnara, the vice-president of the hospital for medical affairs. Subsequently, he spoke to McDonald about the incident and said that Kierce's remark made his practice group feel unsafe at the hospital.

McDonald and Jimenez went to CWH's Ridgewood office and met with plaintiffs and other CWH doctors to hear their complaints about Kierce. Vosough demanded that Kierce be fired and that Vosough and other attending physicians have a greater voice in running the OB/GYN department. McDonald promised that an

A-3017-11T1

investigation of Kierce's conduct would be undertaken by Jimenez and Labagnara. According to plaintiffs, the investigation was a sham, and McDonald and the hospital took no action to discipline Kierce for his "rip your skulls" threat.

On June 8, 2006, plaintiffs resigned from their staff privileges at St. Joseph's hospital. Vosough wrote:

> Due to Dr. Roger Kierce's public threat to "Rip Our Skulls from your Skeletons" in front of St. Joseph's Labor and Delivery Staff, and his further statement "I keep a headcount": CWHC does not feel safe practicing in St. Joseph's Healthcare System.
>
> Although I have nothing but the best of comments to bestow upon the staff at the Wayne Campus, I am currently stepping down to courtesy privileges at Wayne and hereby resign from St. Joseph's Regional Medical Center, effective immediately. This includes all physicians currently employed by CWHC except Dr. Shihad and Dr. Kuegler.
>
> In my opinion in a wor[l]d where big corporations no longer tolerate sexual harassment, hospital should no longer tolerate these comments, coming from their chairmen to their staff, in any way, shape or form.

Upon sending the June 2006 resignation letter, plaintiffs immediately stopped admitting patients at St. Joseph's Paterson facility, but they continued to admit patients to the hospital's Wayne facility for a while because of certain contractual obligations. The CWH Paterson office was across the street from

A-3017-11T1

St. Joseph's hospital, and Vosough described it as "the most convenient office I have ever had." That office had allowed his practice group to have many hospital employees as patients. According to Vosough, their termination of the ICAs and relinquishment of staff privileges "crushed" CWH's practice, requiring Vosough to work "incredible hours" to save the practice. After the resignations, he and the other CWH doctors worked more at Valley Hospital and St. Mary's, and eventually also expanded to Mountainside Hospital in Montclair. In time plaintiffs closed CWH's Paterson office, which had been the hub of their offices, and the closing set the practice back by four or five years, according to Vosough.

Plaintiffs presented testimony from a forensic accountant regarding their loss of anticipated future income that resulted from the termination of their ICAs and resignation from admitting privileges at St. Joseph's hospital. The expert's December 2010 report calculated total losses of $1,269,079 for calendar years 2007 through 2010, and estimated additional losses of $1,450,000 for the following five years through 2015. Upon defendants' objection to the anticipated expert testimony, the trial court conducted a hearing under N.J.R.E. 104(a) and ruled that the expert could testify about his calculation through the time of the report, ending in 2010, but that his

estimate of future losses beyond the time of the report was speculative and would not be admitted in evidence.[3]

After deliberating for only thirty-five minutes, the jury returned a verdict finding St. Joseph's hospital liable for breach of contract and Kierce and McDonald liable for interference with plaintiffs' contracts and prospective economic advantage. The jury awarded total damages of $1,500,000, assigning one-third of that amount to each defendant.

Because the jury's award was more than the $1,269,079 in losses alleged by plaintiffs' expert and admitted in evidence, the trial court instructed the jury that its damage award was improper and that it should deliberate further on damages based on the evidence that was admitted. The jury returned after a few additional minutes of deliberation with a verdict of $423,026.33 against each of the three defendants, thus totaling the maximum amount in plaintiffs' case, $1,269,079.

---

[3] In response to plaintiffs' forensic accounting evidence, defendants presented expert testimony that plaintiffs' tax returns actually showed increase in revenues after their resignations from St. Joseph's, and therefore, they suffered no loss of income as a result of the resignations. The defense expert also testified that any damages alleged by plaintiffs should be limited to the sixty-day notice of termination clause of their ICAs and that plaintiffs presented no evidence that they suffered any monetary losses during the sixty days after their resignation letters of February 25 and June 8, 2006.

A-3017-11T1

The trial court dismissed plaintiffs' claim for punitive damages and denied all other post-trial motions, both the motions filed by defendants for judgment in their favor or a new trial and the motion filed by plaintiffs to add prejudgment interest to the jury's award. This appeal and cross-appeal followed.

III.

We first address plaintiffs' claims of tortious interference with their ICAs and with their prospective economic advantage of using their staff privileges at St. Joseph's hospital to treat patients and derive income.

Because plaintiffs' ICAs were contracts with the hospital and not with its individual executives and managers, McDonald and Kierce could not be held personally liable to plaintiffs for their actions that constituted alleged breach of the ICAs. "[A] corporation is an artificial entity that lacks the ability to function except through the actions of its officers, directors, agents, and servants," but those individuals "are not parties to any contract" of the corporation. Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 761 (1989). "A corporation is regarded in law as an entity distinct from its individual officers, directors, and agents." Ibid.; see also Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303-05 (2002) (corporate

19

officers and employees may be charged individually under a participation theory with a tort committed by the corporate employer, but not for breach of contract by the corporation). Recognizing this basic concept of contract and agency law, plaintiffs charged only the hospital with breach of contract in the first count of their complaint.

Conversely, the hospital could not be charged with tortious interference with its own contract. Printing Mart, supra, 116 N.J. at 752; see also Cappiello v. Ragen Precision Industries, Inc., 192 N.J. Super. 523, 529 (App. Div. 1984) ("[I]nterference with one's own contract is merely a breach of that contract."). Consequently, the individual defendants alone were charged in the second and third counts of plaintiffs' complaint.

"The tort of interference with a business relation or contract contains four elements: (1) a protected interest; (2) malice — that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." DiMaria Const., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001), aff'd o.b., 172 N.J. 182 (2002); accord MacDougall v. Weichert, 144 N.J. 380, 404 (1996); Printing Mart, supra, 116 N.J. at 751-52.

Theoretically, employees and agents of a corporation can be charged with the tort of intentional interference with a plaintiff's contract with the corporation. Printing Mart, supra, 116 N.J. at 761-63. However, "if an employee or agent is acting on behalf of his or her employer or principal, then no action for tortious interference will lie." DiMaria Const., supra, 351 N.J. Super. at 568. "[A]n action for tortious interference will lie" only if "the employee or agent is acting outside the scope of his or her employment or agency." Ibid.

To recover for tortious interference, plaintiffs were required to prove that the alleged wrongful actions of Kierce and McDonald were outside the scope of their employment and done for personal motives, out of malice, beyond their authority, and otherwise not in good faith in the interests of the hospital. See ibid. (citing Varrallo v. Hammond Inc., 94 F.3d 842, 849 n.11 (3d Cir. 1996); George A. Fuller Co. v. Chicago Coll. of Osteopathic Med., 719 F.2d 1326, 1333 (7th Cir. 1983)). In this context, "malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart, supra, 116 N.J. at 751 (citing Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 563 (1955)).

Kierce and McDonald contend that no rational jury could conclude they acted outside the scope of their employment in the

21 A-3017-11T1

matters alleged by plaintiffs. Plaintiffs' allegations against Kierce are that he was insulting, demeaning, and belligerent in his verbal communications with them when he was supervising them in the OB/GYN department and that he threatened them regarding their contracts with St. Mary's hospital in an effort to persuade them not to resign as staff physicians. Their allegations against McDonald are only that he failed to do more to investigate Kierce's behavior and to discipline him for violating the hospital's bylaws. Defendants argue that the actions alleged against them are directly linked to the performance of their job duties within the scope of their employment by the hospital.

Plaintiffs respond that whether the individual defendants were acting within the scope of their employment was a fact issue properly reserved for the jury to decide.

The question of whether an individual acted within or outside the scope of employment often arises in the context of intentional wrongful acts of the individual employee that the corporation disavows in order to avoid respondeat superior liability. A number of cases in which a plaintiff alleged intentional or reckless assault have found that the employee nevertheless was or could be found to have acted within the scope of his employment although he exceeded lawful or proper

A-3017-11T1

means in carrying out his duties. See, e.g., Gibson v. Kennedy, 23 N.J. 150, 154-57 (1957) (train conductor who assaulted passenger for failing to get off train was acting within the scope of his employment); Mason v. Sportsman's Pub, 305 N.J. Super. 482, 499-501 (App. Div. 1997) (tavern's bouncer was acting within the scope of his employment when his physical ejection of a patron resulted in injury to the patron); Schisano v. Brickseal Refractory Co., 62 N.J. Super. 269, 275-76 (App. Div. 1960) (employee who punched decedent during an argument about parking in his employer's private lot, causing him to suffer a fatal heart attack, could be found to have been acting within the scope of his employment); Smith v. Bosco, 126 N.J.L. 452, 453-54 (E. & A. 1941) (bridge employee's attack on plaintiff who refused to move his truck could be within the scope of his employment); Gates v. St. James Operating Co., 122 N.J.L. 610, 611-12 (Sup. Ct. 1939) (assistant manager who slapped patron for disregarding his instruction to "take your feet down" could have been acting within the scope of his employment). The fact that the employee's conduct is intentional and wrongful does not in itself take it outside the scope of his employment.

On the other hand, the employee's wrongful conduct may be so far removed from the scope of his duties that the conduct

cannot be viewed as within the scope of the employment. See Davis v. Devereux Foundation, 209 N.J. 269, 305-06 (2012) (employee of residential facility who intentionally scalded developmentally disabled resident with hot water was personally motivated by a desire to punish the resident for striking her earlier and was not acting within the scope of her employment in trying to control the resident); Di Cosala v. Kay, 91 N.J. 159, 165, 169 (1982) (Boy Scout Council was not vicariously liable for camp counselor's reckless act of pointing a gun at a child and pulling the trigger during a purely social visit because the counselor's interaction with the victim was not part of his work duties or done during his work time); Cosgrove v. Lawrence, 214 N.J. Super. 670, 679 (Law. Div. 1986), aff'd, 215 N.J. Super. 561 (App. Div. 1987) (county social worker's initiation of a sexual relationship with his patient "was too little actuated by a purpose to serve" the employer's goals).

Describing the test to be applied in intentional assault cases, Chief Justice Weintraub wrote in Gibson, supra, 23 N.J. at 158:

> Assaults and batteries rarely, if ever, redound to the economic advantage of the employer, and it may readily be assumed the employer would not wish them. The outrageous quality of an employee's act may well be persuasive in considering whether his motivation was purely personal, but if the employee is within the scope of

> employment and intends to further the
> employer's business, the employer is
> chargeable even though the employee's
> conduct be "imbecilic."
>
> [(citation omitted) (quoting <u>Nelson v. Am.-
> W. African Line, Inc.</u>, 86 <u>F.</u>2d 730, 732 (2d
> Cir. 1936), <u>cert. denied,</u> 300 <u>U.S.</u> 665, 57
> <u>S. Ct.</u> 509, 81 <u>L. Ed.</u> 873 (1937)).]

As Judge Learned Hand had observed in <u>Nelson</u>, <u>supra</u>, 86 <u>F.</u>2d at 731-32, "motives may be mixed; men may vent their spleen upon others and yet mean to further their master's business; that meaning, that intention is the test."

Relying on this understanding of the law, defendants argue that, even if the evidence were sufficient to show they had a personal motive, at least part of their intention was to perform their duties as an employee or officer of the hospital. We agree. There is no question that Kierce and McDonald were performing their duties, respectively as chairman of the OB/GYN department and as CEO of the hospital, when they engaged in the acts alleged by plaintiffs.

In <u>Davis</u>, <u>supra</u>, 209 <u>N.J.</u> at 302-03, our Supreme Court analyzed further how courts should distinguish between conduct that is within the scope of employment and conduct that is outside that scope:

> "The scope of employment standard,
> concededly imprecise, . . . 'refers to those
> acts which are so closely connected with
> what the servant is employed to do, and so

fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment.'"

[Id. at 302 (quoting Di Cosala, supra, 91 N.J. at 169 (quoting W. Prosser, Law of Torts 460-61 (4th ed. 1971)).]

The Davis Court listed four factors "that collectively support a finding that an employee's act is within the scope of his or her employment," quoting the factors from the Restatement (Second) of Agency § 228(1) (1958):

> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master; and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> [Davis, supra, 209 N.J. at 303.]

The Court added that "[c]onversely, an employee's act is outside of the scope of his or her employment 'if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" Ibid. (quoting Restatement, supra, § 228(2)).

Applying these tests and factors, we conclude that plaintiffs had no evidence that McDonald was acting outside the

scope of his employment when he promised to investigate Kierce's misconduct but his efforts were allegedly inadequate and ineffective. McDonald's representation that he would investigate was the kind of task he was employed by the hospital to perform, it occurred at the time and place he was performing his duties for the hospital, and it was intended to serve the purposes of the hospital in managing its staff. Plaintiffs' allegation that McDonald performed his duties poorly does not place his conduct outside the scope of his employment and permit plaintiffs to recover damages from him under tort law. See New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 494 (App. Div. 1985) ("There is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made." (quoting Prosser and Keeton, Law of Torts, § 92 at 655 (1984))); see also Saltiel, supra, 170 N.J. at 316 ("[A] tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law.").

Plaintiffs were dissatisfied with McDonald's performance and his failure to enforce the hospital's physician bylaws and to rescind the new policy announced by Kierce. But plaintiffs' dissatisfaction was not evidence of conduct outside McDonald's scope of employment.

Similarly, with respect to Kierce, all the incidents occurred in the course of Kierce's employment as the chairman of the OB/GYN department, they occurred at the time and place where Kierce performed his duties as chairman, and he was motivated, however misguidedly, by his desire to supervise in his own way the work and performance of physicians and employees in his department. Whether his methods were good or bad does not change their nature and purpose as acts performed on behalf of the employer.

In Davis, supra, 209 N.J. at 305, the Court noted an important consideration in attributing wrongful conduct to the scope of employment — "the starting point of each incident: the employee's attempt to serve the employer." Here, the evidence allowed no finding other than both Kierce and McDonald were attempting to serve their employer, St. Joseph's hospital, even if their methods were improper or their diligence subject to criticism.

Plaintiffs emphasize the holding of DiMaria, supra, 351 N.J. Super. 558, in support of their contention that the evidence permitted the jury to conclude that the actions of Kierce and McDonald were outside the scope of their employment. In DiMaria, however, evidence was presented from which the jury could conclude the plaintiff's contract was terminated without

justification, and on the basis of false information given by the individual defendants, and at their urging. Id. at 570. Also, there was evidence that the individual defendants stood to benefit personally by the termination of the plaintiff's contract. Id. at 573.

Similarly, plaintiffs' strong reliance on Cappiello, supra, 192 N.J. Super. 523, is misplaced. In that case, we confirmed that the plaintiff's corporate employer could breach but could not tortiously interfere with its own contractual obligation to pay commissions to the plaintiff. Id. at 529. The president of the corporation and the plaintiff's supervisor could be liable for tortious interference because, as the jury specifically found, they had agreed to deprive the plaintiff of commissions that were due to him so that they could procure those commissions for their own economic benefit. Ibid.

Here, in contrast to DiMaria and Cappiello, plaintiffs had no similar evidence from which the jury could conclude that Kierce and McDonald intended to harm plaintiffs with respect to their ICAs or staff privileges because defendants stood to gain personally from plaintiffs' resignations. There was no evidence of economic or other personal benefit to Kierce and McDonald resulting from plaintiffs' resignations.

Furthermore, as we have stated, the conduct of Kierce and McDonald that plaintiffs alleged constituted tortious interference was the same conduct on behalf of St. Joseph's hospital that plaintiffs alleged constituted the hospital's breach of contract. While it is not improper to plead and attempt to prove alternative theories of recovery, the two theories could not co-exist in the jury's verdict. The trial court erred in allowing the jury to find liability and award damages simultaneously on both contract and tort causes of action by treating precisely the same conduct as both within and outside the scope of employment.

Defendants were entitled to judgment dismissing counts two and three of plaintiffs' complaint because the evidence did not permit a rational jury to conclude that Kierce and McDonald acted outside the scope of their employment when they engaged in the wrongful conduct alleged by plaintiffs.

Having reached that conclusion, we need not address defendants' alternative arguments that plain error in the jury instruction, error in the verdict sheet, erroneous admission of evidence, and insufficiency of evidence of wrongful purpose also entitle them to judgment in their favor or a new trial on counts two and three.

A-3017-11T1

IV.

Our difficulty with the breach of contract claim alleged in count one stems from a different deficiency in plaintiffs' theory of recovery — the absence of compensable damages resulting from the alleged breach by St. Joseph's hospital. The ICAs did not guarantee any period of time beyond sixty days that the hospital was contractually obligated to plaintiffs, and the implied terms of the ICAs that plaintiffs claimed the hospital breached were not ones the hospital was legally or contractually obligated to retain beyond those sixty days.

Initially, we note that we may conduct plenary review on appeal regarding matters of contract interpretation. Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med. & Physical Therapy, 210 N.J. 597, 605 (2012). In Kieffer v. Best Buy, 205 N.J. 213 (2011), the Court stated: "The interpretation of a contract is subject to de novo review by an appellate court. Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Id. at 222-23 (citation and footnote omitted); see also Jennings v. Pinto, 5 N.J. 562, 569-70 (1950) ("general rule that the construction of a contract is a question of law"). The court's ultimate goal is to determine the intent of the parties, as expressed in the language they used in the contract and as

determined by the circumstances of the parties' relationship and their objectives.  Celanese Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009).

On this record, the hospital could not be held liable to compensate plaintiffs for their financial losses indefinitely into the future, or through 2010 as allowed by the trial court, even if the resignations could rationally be deemed to be a constructive termination of the ICAs by the hospital.  That is so because plaintiffs' claim of breach of contract is entirely dependent on the hospital's alleged contractual undertaking to enforce its own bylaws and its prior policy on the responsibilities of attending physicians, and the hospital had no obligation to retain those allegedly implied terms of its ICAs.

First, with respect to the change in policy that attending physicians would be responsible for all patients during their duty hours, nothing in plaintiffs' ICAs restricted defendants' right to set hospital policy.  While the hospital could voluntarily take into account views of the plaintiffs and other attending physicians in setting hospital policy, plaintiffs' contracts gave them no policymaking rights.  If plaintiffs were dissatisfied with a change in hospital policy, they had a right to terminate their ICAs.  Assuming that the jury credited plaintiffs' allegations and did not accept defendants'

contentions, the change in policy nevertheless did not support

plaintiffs' claims of breach of contract.[4]

Second, with respect to the hospital's failure to enforce

the bylaws, if plaintiffs' February 25, 2006 resignation is

considered to be a constructive termination of their ICAs, the

hospital's breach could only be for a period of sixty days

because the hospital had an absolute right to terminate the ICAs

without cause or justification on sixty days' notice.  Had

plaintiffs openly complained to the hospital that they

considered it in breach of the ICAs because it failed to enforce

the bylaws,[5] the hospital had a right to terminate the ICAs on

sixty days' notice and to clarify that, thereafter, it would

undertake no obligation to enforce the bylaws at plaintiffs'

urging.

Without a legal or contractual duty to perform as

plaintiffs would have had the hospital perform, the hospital

---

[4] For the same reason, the decision of Kierce to change his
department's policy and that of McDonald to support that change
could not be the basis for plaintiffs' claim of tortious
interference with their contractual rights.

[5] We note that plaintiffs' February 25, 2006 resignation letter
from the ICAs did not allege breach of contract by St. Joseph's
hospital for failing to enforce the bylaws.  Although the June
8, 2006 resignation from staff privileges may be read to have
done so, the ICAs were no longer in effect at that time, and
plaintiffs' breach of contract claim was based on the ICAs.

cannot be held liable for the future consequential or anticipatory damages that the jury awarded to plaintiffs.[6]

There is no question that Kierce's conduct violated several provisions of the bylaws that we previously quoted. Defendants contend that the hospital was not obligated to do anything about Kierce's violations. They dispute plaintiffs' contention that the physician bylaws bound the hospital as well as the plaintiff physicians and required that the hospital enforce the bylaws. We will accept the jury's apparent finding that the bylaws bound the hospital as well as the physicians. We will also accept the jury's apparent finding that the hospital was obligated to enforce the bylaws and to discipline a physician who violated them. Granting plaintiffs the favorable findings of the jury on these disputed issues, we also accept for purposes of our analysis the jury's apparent finding that, by failing to enforce its bylaws, the hospital breached the ICAs.

A material breach of a contract relieves an aggrieved party of its obligations under the contract. Nolan v. Lee Ho, 120 N.J. 465, 472 (1990); Magnet Res., Inc. v. Summit MRI, Inc., 318

---

[6] Plaintiffs claimed loss of profits from resignation of their staff privileges as consequential loss of future profits on their breach of contract claim and as damages attributable to the individual defendants' alleged tortious interference with economic advantage. However, neither the court's instructions nor the jury verdict sheet delineated what the jury's damage award of $423,026.33 against each defendant encompassed.

N.J. Super. 275, 285 (App. Div. 1998). Here, such a right was explicitly stated as a term of the ICAs. Plaintiffs exercised their right to cease performing under their ICAs when they resigned their attending physician positions by their letter of February 25, 2006.

Another right or remedy resulting from a breach of contract is the recovery of monetary damages that resulted from the breach. In Preston v. Claridge Hotel & Casino, Ltd., 231 N.J. Super. 81, 88 (App. Div. 1989), we stated that:

> The recovery of damages in breach of contract actions is limited by the general principles that:
>
> (1) the damages are those arising naturally according to the usual course of things from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as a probable result of the breach; and (2) there must be reasonably certain and definite consequences of the breach as distinguished from the mere quantitative uncertainty.
>
> [(citing Tessmar v. Grosner, 23 N.J. 193, 203 (1957))].

The issue here is what damages arose naturally from the hospital's breach of the ICAs, or what obligations and potential damages in the event of a breach were reasonably in the contemplation of the parties when they entered into the ICAs. Plaintiffs claim they are entitled to recover their anticipated

A-3017-11T1

net income that would have been derived from continuing indefinitely their ICAs and staff privileges because that was their intent when they executed their ICAs. Defendants contend that plaintiffs are not entitled to any such recovery for an indefinite period because the ICAs were "at will" contracts that either party could terminate on sixty days' notice.

Analogizing plaintiffs' ICAs to employment contracts, "an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." Wade v. Kessler Inst., 172 N.J. 327, 338 (2002). "An employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise." Ibid. (citing Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 397 (1994)).

In Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 285 (1988), the Court confirmed the long-standing at-will employment doctrine. The Court quoted as follows from Savarese v. Pyrene Manufacturing Co., 9 N.J. 595, 600-01 (1952), which in turn was quoting Eilen v. Tappin's, Inc., 16 N.J. Super. 53, 55 (Law Div. 1951):

> [I]n the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the

services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor.

There are exceptions, however, to the at-will employment doctrine. "For example, an employer's grounds for termination cannot be contrary to public policy, or based on impermissible factors such as race." Wade, supra, 172 N.J. at 338-39 (citing Pierce, supra, 84 N.J. at 71-72; Witkowski, supra, 136 N.J. at 398). In addition, bad faith interference with the other party's right to benefit from the "fruits of the contract" may constitute breach of the implied covenant of good faith and fair dealing that is implied in every contract, and may result in compensable damages despite the right of the party that acted in bad faith to terminate an at-will contract. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420-21, 424-25 (1997).

In this case, since remedies against discrimination or other protected activity are not at issue, the exception to the at-will employment doctrine that comes closest to plaintiffs' claims is an implied contractual exception established by the Supreme Court in Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, modified on other grounds, 101 N.J. 10 (1985). The Court held that an employer may be bound by an implied promise

contained in an employee handbook that an at-will employee would not be terminated without cause and without adhering to procedural protections.  Id. at 297-98.  Such "job security provisions" of a handbook, id. at 297, without a clear and prominent disclaimer, id. at 309, would be deemed a promise that the employer made to the employee to induce the employee to continue in that employment.  Id. at 302.  The employer could not promise job security and later withdraw it.  See id. at 299-300.

The holding of Woolley, however, focused on enforceable termination and job security provisions of a unilateral offer of employment made by the employer and upon which the employee relied.  Ibid.  Neither Woolley nor any of the cases that have applied its holding and guiding principles were intended to prevent the parties from altering other terms of a contract that were not job security provisions.

In this case, the ICAs contained no job security provision. The hospital did not promise that it would not terminate plaintiffs' ICAs without good cause or for no reason.  In fact, the contract explicitly gave the parties mutual rights to terminate the ICAs on sixty days' notice without good cause and for no reason or justification.

A-3017-11T1

The bylaws that plaintiffs alleged the hospital violated and the policy that defendants changed are not job security provisions of the ICAs. Assuming they are implied terms of the contracts between the parties, they could be altered or modified, just as, for example, the $100 hourly rate of the ICAs could be modified with proper notice. If the hospital wished to modify the ICAs to clarify that it did not consider itself bound to enforce the bylaws, the hospital could terminate the existing ICAs and add an explicit modifying term to a renewed ICA. Plaintiffs could then accept or reject the new terms of the ICA.

In the absence of a legal or contractual obligation to retain a specific term of the contract, plaintiffs could not reasonably expect that they would be indefinitely entitled to a contract with such a term, and thus be entitled to recover their losses because the hospital declined to abide by that term.

Nor does the covenant of good faith and fair dealing convert all terms of an at-will employment contract into an immutable and binding contract for an indefinite time. The facts of this case are distinguishable from Sons of Thunder, supra, 148 N.J. at 401-02, 427, where the Court permitted recovery of anticipated future profits for a defined time period although the contract contained an at-will termination clause similar to the one in this case. In Sons of Thunder, the jury

39

actually found that the defendant had breached the implied covenant of good faith and fair dealing by encouraging the plaintiff to invest in assets to carry out a five-year contract and then the defendant's new executives completely cut off the plaintiff's ability to earn income from the contract. Id. at 402-06, 412-13.

In this case, St. Joseph's hospital did not represent to plaintiffs that the ICAs would endure for any longer than sixty days, and moreover, plaintiffs were not deprived of the ability to earn income as they had before through their association with the hospital. The implied terms of the ICAs that the hospital allegedly breached, enforcement of the bylaws and change of the policy pertaining to the responsibilities of attending physicians, may have affected plaintiffs' work conditions, but the breach did not destroy the right of plaintiffs "to receive the fruits of the contract." See id. at 420. Every breach of contract is not a breach of the implied covenant of good faith and fair dealing that converts an open-ended at-will contract into one that binds the parties indefinitely to all its terms.

Where a contract has been breached, "[c]ompensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.'" 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J.

251, 254 (1961) (quoting 5 Corbin, Contracts § 992 at 5 (1951); citing 1 Restatement, Contracts § 329, comment a (1932)); accord In re Liquidation of Integrity Ins. Co., 147 N.J. 128, 136 (1996); Donovan v. Bachstadt, 91 N.J. 434, 444 (1982). So the question here is what would plaintiffs have derived from their ICAs and staff privileges if the hospital had not breached the contract by failing to enforce the bylaws. The hospital's promise did not assure plaintiffs of any period that their ICAs would remain in effect beyond sixty days or, more important for purposes of the issue in dispute, any period of time beyond sixty days during which the bylaws and prior policy would remain in effect and bind the hospital to enforce them.

If the hospital materially breached the ICAs by failing to enforce the bylaws and by changing a policy, plaintiffs could stop performing their duties, as they did. They could then file suit for their lost income or profits. But their damages would not extend indefinitely into the future. If the breach was a unilateral modification of terms of the contract, plaintiffs could recover their losses arising from the hospital's failure to give them sixty days' notice of termination of the existing contract and substitution of a new one with the altered terms.

"When a wrongful discharge of an employee occurs the measure of damages is usually the employee's salary for the

41                                                          A-3017-11T1

remainder of the employment period."  Goodman v. London Metals Exch., Inc., 86 N.J. 19, 34 (1981) (citing Moore v. Central Foundry Co., 68 N.J.L. 14, 15 (Sup. Ct. 1902)).  The "employment period" in this case was sixty days, that is, the durational limit of each party's promise to the other that it would perform in accordance with the terms of the ICAs.  In effect, the enforceable at-will term of the ICAs, as modified by a sixty-day notice provision, defined the expectations of the parties with respect to the obligations of each to the other.  Concomitantly, it capped the potential anticipatory damages of the parties to losses incurred during that sixty-day period.

Plaintiffs presented no evidence that they suffered any losses during the sixty-day period before or after their February 25, 2006 resignation as attending physicians.  They were paid for the hours they worked.  Their expert accounting evidence commenced calculation of their lost income in calendar year 2007, some ten months after they terminated their ICAs.

Plaintiffs' resignation from staff privileges provided even less ground for recovery of future income and profits from the hospital.  The hospital had made no promise that the bylaws and policies upon which plaintiffs agreed to be associated with the hospital would be retained indefinitely.  Plaintiffs were not required to continue their relationship with the hospital any

42                                    A-3017-11T1

more than the hospital was required to retain plaintiffs' staff privileges on the same terms that applied when those privileges were initially granted. Plaintiffs simply had no enforceable expectation of income and profits from continuation of their staff privileges on terms that they desired and demanded.

In short, plaintiffs did not have a viable breach of contract claim against St. Joseph's hospital because the hospital had limited obligations to them under the ICAs and their staff privileges, and the termination of the relationship, even if caused by the hospital's actions, was within the rights retained by the hospital. Consequently, as a matter of law, plaintiffs' loss of future income and profits outside the sixty-day obligations of the parties pursuant to the ICAs could not be attributed to wrongful termination of their ICAs or staff privileges. Plaintiffs presented no evidence that they suffered any compensable damages as a result of the acts of the hospital's agents. The trial court should have granted the hospital's motions to dismiss count one of the complaint.[7]

---

[7] In their several motions for summary judgment and judgment during and after the trial, defendants made multiple arguments as to why plaintiffs' evidence was not sufficient to recover the damages they claimed. Our analysis as discussed in this opinion was not clearly and articulately presented to the trial court in defendants' arguments, but the argument that plaintiffs were not entitled to damages for an indefinite period was made and

(continued)

V.

Because we have determined that all defendants were entitled to judgment in their favor, plaintiffs' cross-appeal is moot, and it will be dismissed.

The judgment awarding damages against defendants is reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

(continued)
defendants' expert testified that plaintiffs could not have been damaged beyond the sixty-day notice period of their ICAs.

A-3017-11T1