**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1830-22

IVAN TYMIV and OKSANA
TYMIV,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

LOWE'S HOME CENTERS, LLC,

      Defendant-Respondent/
      Cross-Appellant,

and

AHMED HASSAN,

      Defendant-Respondent.

_____

Argued November 18, 2024 – Decided August 22, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6536-17.

Richard A. Vrhovc argued the cause for appellants/cross-respondents.

Thaddeus J. Hubert, IV argued the cause for respondent/cross-appellant (Goldberg Segalla LLP, attorneys; Thomas M. Crino and Thaddeus J. Hubert, IV, of counsel and on the briefs; Leo Capoferri, on the briefs).

Jeffrey J. Czuba argued the cause for respondent (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Jeffrey J. Czuba, of counsel and on the brief).

PER CURIAM

Plaintiffs Ivan Tymiv and Oksana Tymiv filed a lawsuit against defendants Ahmed Hassan and Lowe's Home Centers, LLC[1] in connection with an altercation that occurred between Tymiv and Hassan at a Lowe's home-improvement store. Tymiv and Hassan gave different accounts of the incident. Hassan, an employee-in-training in the flooring department of the store, had attempted unsuccessfully to assist Tymiv in selecting grout. According to Tymiv, Hassan punched him while holding a broomstick. According to Hassan, he hit Tymiv to deflect an incoming punch from Tymiv after Tymiv had thrown a bag of grout at him. After the jury returned a verdict in defendants' favor in the liability phase of a bifurcated trial, the trial court dismissed the complaint with prejudice.

---

[1] For ease of reading, we refer to Ivan Tymiv and Ahmed Hassan by their last names, Oksana Tymiv by her first name, and Lowe's Home Centers, LLC as Lowe's.

Unpersuaded by plaintiffs' argument the trial court erred in the admission of certain evidence, its jury charge, and its decisions regarding the scope of counsels' summations, we affirm the dismissal order. Because we affirm that order, we do not reach the arguments raised by Lowe's in its cross-appeal of an order denying its motion for a directed verdict.

I.

On May 4, 2017, Lowe's hired Hassan as a Customer Sales Associate (CSA) in the flooring department of its Marlboro store. He previously had spent two summers working as a cashier in that store. According to Hassan, he had no prior experience in flooring and was "counting on the training" to teach him about relevant products. After completing approximately sixteen hours of training over the course of two days, Hassan was considered to be in-training and was not yet permitted to wear the "Red Vest" of a Lowe's employee.

Christine Jennings, a human resources manager at the store, testified she had believed Hassan was adequately trained by May 13, 2017, had completed CSA training previously when he was hired as a cashier, and knew the essential skills of his position. Ryan Madden, an assistant manager who had supervised Hassan previously, testified Hassan had significant experience dealing with customers and had "previous experience helping out customers." Madden had

A-1830-22

not received any complaints about Hassan or reports of any altercations involving him. He considered Hassan "[v]ery reliable"; "[a]lways willing to help, and always willing to learn"; and a "valued team member."

Both Jennings and Madden testified Lowe's had a policy to allow employees who had not fully completed CSA training to interact with customers without supervision. Jennings said that policy enabled employees-in-training to get on-the-job experience and become "comfortable with speaking with all the customers." George Craig, who supervised the flooring department, testified he had observed Hassan helping customers on his own and noted Hassan had sought out more senior employees for assistance with customer questions if he did not know the answers to them. Craig described Hassan as "mellow" and "courteous and helpful." He said Hassan had acted appropriately with customers and he was comfortable leaving Hassan alone on the floor despite his incomplete training.

On May 13, 2017, Tymiv and his customer, Serge Oganov, were in Aisle 42 of Lowe's Marlboro store looking for unsanded grout. Hassan was sweeping Aisle 42 with a push-broom when he approached them and asked if he could help them. Tymiv, who was holding a ten-pound bag of grout, asked Hassan whether it was sanded or unsanded. In his statement to police and answers to

interrogatories, relevant portions of which were read to the jury, Tymiv said Hassan had told him the grout he was holding was "good" and that he "should use it." However, he did not answer whether the grout was sanded or unsanded. Tymiv told Hassan to learn more about grout before trying to help customers.

At trial, Tymiv testified Hassan had "flipped out," "said [the] F word," and told Tymiv, "I have [a] PhD in history, I don't have to learn this." Hassan walked away and resumed his sweeping. This interaction "upset" Tymiv, who followed Hassan into Aisle 43 while carrying the bag of grout against his chest. He repeatedly asked Hassan his name, so he could make a complaint about him.

According to Tymiv, Hassan suddenly turned around and walked towards Tymiv until his chest was touching the bag of grout, saying, "[W]hat are you going to do?" Hassan then "hit[] the grout bag out of [Tymiv's] hand knocking [it] down in the air." Tymiv testified Hassan had "knocked this thing up in the air" and "the bag went up . . . hit[ting] the shelf," causing the grout to go "all over." Tymiv smirked at Hassan, to express the sentiment "see what you did?" He testified the grout went all over him and Oganov after the incident but admitted police bodycam footage did not show any grout on Oganov. According to Tymiv, Hassan then punched him in the left temple while holding the broomstick in his hand.

5

Oganov gave different descriptions of the incident during his deposition, portions of which were read to the jury, and at trial. At his deposition, he testified the bag of grout had ripped in Tymiv's hands and did not leave Tymiv's grasp. However, at trial he testified Hassan had struck the bag, causing grout to fly straight up and then to come down on all three men. Oganov claimed there was grout "all over [him]," on his "upper and lower body." However, he admitted he could not see any grout on him or Tymiv in the bodycam footage and could not explain why. Oganov further testified he did not think Hassan's conduct was initially aggressive and that Hassan had asked to be left alone and had walked away.

Hassan did not appear at the trial. During his deposition, a video of which was played for the jury, Hassan gave a different account of the incident. He confirmed he had approached Tymiv and Oganov to see if they needed assistance. He testified Tymiv had asked him about the difference between sanded and unsanded grout and that he started to explain the different jobs for which each variety was best used. However, Tymiv became agitated and told Hassan he should learn more about products before answering customer questions. Hassan felt that Tymiv had gone "from zero to one hundred angry" in the course of their short conversation, and so he decided to walk away to

A-1830-22

defuse the situation. He denied using profanity or mentioning his education and stated he had been "professional" toward Tymiv.

According to Hassan, Tymiv followed him as he tried to continue sweeping, yelling at him and demanding his name. Hassan glanced behind and saw Tymiv approaching quickly with one fist clenched. Hassan again turned away to avoid further interaction with Tymiv. Immediately thereafter, Hassan felt the bag of grout Tymiv had been holding strike him in the back of his neck, head, and shoulders. He "didn't lose consciousness" but "saw stars." Hassan turned around quickly and used his broomstick to block an incoming punch from Tymiv. In doing so, he struck Tymiv in the head with the handle of the broom "as a defensive mechanism."

Hassan testified he had walked away from the scene because he was "fearing for [his] life." He found a coworker, Heidi Rappleyea, and asked her to call security because he had been assaulted by a customer who was still following him. Hassan then proceeded to the human resources and training area of the store, hoping to escape Tymiv. Once there, he called the police. The description of the incident Hassan gave during his deposition was consistent with the descriptions of the incident he had given to the police, Jennings, and Craig.

A-1830-22

Rappleyea testified she had called Madden, who was on duty as a supervisor that day. Madden came to the training area and saw Hassan "covered in grout all down the back side of his body."

Corporal Dennis DeMiceli and Corporal Joseph Meglio of the Marlboro Police Department responded to the scene and interviewed Tymiv, Hassan, and other store employees. Initially, Tymiv told police the bag of grout had ripped in his hands after Hassan pushed him. DeMiceli spoke to Hassan in a separate room. He told DeMiceli he was "in training" and "[didn't] know much" and that he had walked away when Tymiv became "confrontational." Hassan reported Tymiv had followed him and had thrown the bag of grout at him.

DeMiceli noticed Hassan was "covered with" grout on his back but "did not have a noticeable amount on the front of him." Meanwhile, DeMiceli "didn't notice" grout on Tymiv or Oganov. Photographs taken by the police showed grout on Hassan's back. The jury also was shown photographs of grout dust spread over the shelving and floor in Aisle 43.

DeMiceli interviewed Tymiv after he had spoken with Hassan. Footage from DeMiceli's body camera was played for the jury during his testimony and Tymiv's direct testimony. During the portions of the footage presented, DeMiceli repeatedly asked Tymiv why Hassan was "covered in grout on the

8

back of him." At first, Tymiv maintained the grout bag had ripped because Hassan pushed him, but then he said the grout was on Hassan's back "because it went up." When further pressed, he said he "ha[d] no idea" how the grout was on Hassan's back only.

Tymiv testified at trial he felt the responding officers did not believe his account of what had happened. He said he believed they were accusing him of assaulting Hassan. He made similar statements during his deposition and to police at the store as captured on the bodycam footage shown to the jury.

While being interviewed by police, Tymiv asked them to call an ambulance because he felt dizzy and nauseous and had a shooting pain in his arm. He was taken to the hospital from the store. Tymiv testified he later had undergone emergency surgery at the hospital.

On November 3, 2017, plaintiffs filed a complaint against defendants in the Law Division and later filed an amended complaint. The amended complaint contained four counts: negligence as to both defendants, battery as to Hassan, loss of consortium on behalf of Oksana, and punitive damages. Plaintiffs alleged Hassan was negligent by "fail[ing] to exercise reasonable care." They alleged Lowe's was negligent by hiring Hassan "when it knew or had reason to know of" his "particular unfitness, incompetence, and/or dangerous attributes . . . and of

9

[his] propensity for criminal and/or violent conduct" and by failing to train and supervise him properly. They claimed Lowe's "knew or should have known of Hassan's inability to properly interact with the general public both because of his propensities for violence and because it had not properly trained him in doing so." Plaintiffs also alleged Lowe's was negligent by failing to "employ supervisors and security personnel and equipment" and "to have in place procedures, polices and controls such as would have deterred and/or prevented [Hassan's] conduct." After filing the amended complaint, plaintiffs amended their answers to interrogatories "to state . . . Hassan was acting within the scope of his employment at the time of the incident and therefore . . . defendant Lowe's is vicariously liable under the doctrine of respondeat superior."

Plaintiffs moved in limine to bar testimony of DeMiceli and Meglio regarding their views about which account of the incident was true and similar statements recorded in their reports, bodycam footage, and deposition testimony. Plaintiffs argued that testimony and those statements were inadmissible lay-opinion testimony under N.J.R.E. 701. The trial court precluded the officers from testifying about "their opinions of how the incident occurred" but permitted them to testify about "any factual issues that they observed, including plaintiff's demeanor, [being] evasive with answers,

defensive, arrogant, and the like." We affirmed the order memorializing that decision. We held:

> [T]he motion judge did not abuse his discretion in barring the responding police officers from testifying about "their opinions of how the incident occurred." The judge did not by rote bar their testimony but expressly held the officers could testify about "any factual issues that they observed, including plaintiff's demeanor, [being] evasive with answers, defensive, arrogant, and the like." His ruling is appropriate under the circumstances and consistent with the law. . . . The police officers did not witness the altercation between [Tymiv] and Hassan. To allow them to opine as to how the altercation occurred would be a clear invasion of the jury's factfinding-province.
>
> [Tymiv v. Lowe's Home Ctrs., LLC, No. A-0222-20 (App. Div. July 30, 2021) (slip op. at 31-32) (first alteration in original).]

After the close of discovery, Lowe's moved for summary judgment on grounds that: (1) it could not be vicariously liable for Hassan's actions because they were not within the scope of his employment, and (2) plaintiffs could not establish that Lowe's was negligent in hiring, training, or supervising Hassan. Id. at 11. Hassan moved for partial summary judgment as to the negligence claims against him. The court granted both motions, leaving in the case only the battery and punitive-damages claims against Hassan. Plaintiffs voluntarily dismissed those claims with prejudice and appealed the summary-judgment

11

orders. We reversed the summary-judgment orders and remanded the case for trial. Id. at 32.

Back in the trial court, Lowe's moved for partial summary judgment as to the negligent-hiring, negligent-security, and punitive-damages claims against it. Plaintiffs did not oppose the motion, and the court granted it, dismissing those claims with prejudice.

In a June 5, 2020 order, the trial court bifurcated the trial such that the liability phase would be tried first and the damages phase, if necessary, would be tried second. The case proceeded to trial in 2023. During the trial, Tymiv, Oganov, DeMiceli, Jennings, Rappleyea, Craig, and Madden testified as fact witnesses. A video of Hassan's deposition testimony was shown to the jury.

During his direct examination, plaintiffs' counsel asked Tymiv what had happened after the incident with the work he was supposed to do for Oganov. Tymiv testified not everything had been "finished" and that Oksana, not Tymiv, had "coordinate[d] with the workers and . . . she was actually doing [the work]."

During Tymiv's cross-examination, Lowe's presented evidence it had obtained from Natasha Sahr, the former fiancée of Tymiv's brother-in-law. The evidence included a 2022 text from Tymiv giving an estimate for a bathroom renovation and photographs taken in 2021 and 2022 of Tymiv riding an all-

terrain vehicle, holding a ladder, and using a chainsaw. Before trial, plaintiffs objected to the submission of Sahr's evidence during the liability phase of the trial, arguing it was relevant only to damages. The trial court overruled the objection, finding Tymiv could be questioned about Sahr's evidence on credibility grounds because "if [Tymiv] lied about his physical abilities, that's an issue . . . in liability."

When Sahr's evidence was introduced during Tymiv's cross-examination, the court gave the following instruction at plaintiffs' counsel's request:

> [T]hese exhibits that are being introduced are being used to challenge the credibility of the witness and can only be used in your assessment of the witness's credibility based on what he has testified what he can or can't do and what the pictures demonstrate about what he can or can't do. You interpret the pictures.

In addition to the fact witnesses who testified, the parties presented the testimony of expert witnesses. On behalf of Lowe's, a biomechanical engineering expert analyzed the evidence to discern the most likely sequence of events. He concluded Tymiv had thrown the bag of grout in Hassan's direction while his back was turned. Alex Balian, an expert in retail operations and management, testified on behalf of plaintiffs in support of their contention Lowe's had been negligent in training and supervising Hassan.

A-1830-22

Before his testimony was presented to the jury, counsel for Lowe's argued for leave to use the responding officers' opinions about the incident to challenge Balian's credibility. Balian had testified during his deposition that he works on cases only if he agrees with the "theory of the case" adopted by the party wishing to hire him. Recognizing our affirmance of the order barring the officers from testifying about their lay opinions, Lowe's asked the court for permission to confront Balian with the officers' views for a different purpose: to challenge his credibility by showing the evidence at the scene of the incident was so one-sided that police had questioned Tymiv's accusation and Balian should have questioned plaintiffs' theory of the case. Lowe's argued, and the trial court agreed, that testimony about the officers' opinions was relevant in that it could potentially undermine the notion that Balian could have believed Tymiv's theory of the case, thereby suggesting Balian was not a credible witness. The trial court granted the motion, indicating it would give a curative instruction and asking counsel "to stop at a point so [the court] can then give that curative instruction and we can go forward."

During Balian's testimony, counsel for Lowe's read a portion of DeMiceli's deposition testimony in which the officer had said Tymiv "would have had to have thrown [the grout] at [Hassan] for it to be on the back of him."

Counsel also read a part of Meglio's deposition testimony in which the officer said there was "only one way" Hassan could have had grout on his back: if his back was toward Tymiv and the grout was thrown at him. Counsel then asked Balian if it was accurate that he had not mentioned DeMiceli's and Meglio's "conclusions" in his expert report and whether he had testified he would work on a case only if he "fe[lt] the case [wa]s valid." Balian replied "correct" to those questions. When queried further about the officers' testimony and the photographic and video evidence, Balian said he "didn't evaluate the actual actions of this incident" and that the "focus of [his] opinions and evaluation was on the training" because he was "not an accident reconstruction expert."

Plaintiffs' counsel did not then request a limiting instruction. The following day, counsel for Lowe's raised the issue of the limiting instruction and asked whether plaintiffs' counsel intended to waive the instruction. Plaintiffs' counsel replied that he was "going to need the instruction" because defense counsel had confirmed he was going to reference the officers' opinions in his closing. Plaintiffs' counsel, however, advised the court it would be "good enough" if the court gave it at the end of the case.

Following the close of plaintiffs' case-in-chief, Lowe's moved for a directed verdict dismissing the negligent-training and supervision claim

pursuant to Rules 4:37-2(b) and 4:40-1.  The court memorialized its denial of that motion in a March 1, 2023 order.

Six days after Balian testified, the court included the following instruction in its charge to the jury at the end of the case:  "During the video testimony of plaintiffs' expert Alex Balian, you heard hearsay deposition testimony of the police witnesses.  I hereby instruct you that you're not to consider the hearsay deposition testimony for its truth because you are the judges of the facts here, not the police."

The court also instructed the jury on Hassan's alleged negligence, whether Hassan was acting within the scope of his employment, the alleged vicarious liability of Lowe's for Tymiv's injuries, and the alleged negligent supervision and training of Hassan by Lowe's.  In its instruction on Hassan's alleged negligence, the court first set forth the elements of negligence and then explained Hassan had denied he was negligent on grounds that any injury Tymiv sustained was inflicted in defense against an assault.  After defining "assault" and "battery," the court stated that if Hassan had proved he "was under attack by [Tymiv]" and used only reasonably necessary protective force, the jury should not find him liable for Tymiv's injuries.  The court continued that if the

16

jury found Hassan was not under attack or that he had used disproportionate force, he could be found at fault for the injuries.

When instructing the jury on how to decide whether Lowe's was vicariously liable for Tymiv's injuries, the court first told the jury it had to determine whether Hassan was acting within the scope of his employment when he inflicted the injuries:

> You may consider the following factors to determine whether Hassan was within the scope of employment at the time of the incident. All four factors must be satisfied in order to find that Hassan was within the scope of employment. One, is it the kind he is . . . employed to perform? Does it occur substantially within the authorized time and space limits? Is it actuated, at least in part, . . . by purpose to serve the employer, and if force is intentionally used by the employee against another, the use of that force is not unexpected by the employer.
>
> When an employee's conduct, however intentional and wrongful, originated in his effort to fulfill an assigned task, then he's acting within the scope of his employment. Thus, if you find at the time of the incident with the plaintiff Mr. Hassan was attempting to serve his employer, then defendant Lowe's will be deemed negligent for the wrongdoing to the same extent as the employee . . . Hassan.

The trial court next instructed the jury that Lowe's could be liable for Hassan's conduct, "but only if [it found] that . . . Hassan acted negligently in self-defense while in the scope of his duties or authorities."

17

A-1830-22

In its instruction on negligent supervision and training, the court explained in pertinent part that an employer "may be held responsible for the criminal, wrongful act of an employee, even if those acts occur outside the scope of employment, if the employer was negligent in the manner in which the employer trained or supervised and retained an employee."

Reviewing the verdict sheets with the jury, the court stated the jury would first need to determine whether Hassan had acted within the scope of his employment. During the charge conference, all parties agreed the scope of employment should be the first issue addressed by the jury. On the verdict sheet for the "Initial Question," the court used language requested by plaintiffs. If the jury answered "yes" to that threshold question, it would answer additional questions on a separate "Within the Scope of Employment" verdict sheet about Hassan's liability for negligence and then apportion fault between Hassan and Tymiv. The questions on that verdict sheet did not reference Lowe's, but the parties agreed Lowe's would be found vicariously liable for whatever percentage of fault the jury attributed to Hassan.

If the jury answered "no" to the threshold scope-of-employment question, it would answer additional questions on a separate "Outside the Scope of Employment" verdict sheet. The first question on that verdict sheet used

18

language proposed by plaintiffs and asked, "[w]as defendant, Ahmed Hassan, negligent during his physical encounter with plaintiff, Ivan Tymiv?"  If the jury answered "no" to that question, it would cease its deliberations.  If it answered "yes" to that question, it would answer additional questions, including questions about whether Lowe's had negligently trained or supervised Hassan.  Depending on its answers to those questions, the jury would apportion fault potentially between Hassan, Lowe's, and Tymiv.  The verdict sheets and the court's explanatory instructions established a process whereby the jury could find Lowe's was either vicariously liable for Hassan's negligence on the "Within the Scope of Employment" verdict sheet or directly liable for its own negligence on the "Outside the Scope of Employment," but not both.

The jury ultimately found Hassan was not acting within the scope of his employment and was not negligent.  In a February 8, 2023 order, the court dismissed plaintiffs' claims against Hassan and Lowe's with prejudice.  This appeal and cross-appeal followed.

## II.

On appeal, plaintiffs argue the trial court erred by allowing Lowe's to introduce evidence of the responding police officers' opinions about the incident and the evidence provided by Sahr.  They also argue the court issued incomplete

and incorrect jury instructions. Finally, they contend the court erred in permitting counsel for Lowe's to state in his closing argument plaintiffs were not suing Hassan for assault and battery and in not permitting plaintiffs' counsel in his closing argument to comment on Hassan's absence from the trial.

A.

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). The scope of cross-examination also "is a matter resting in the broad discretion of the trial court." State v. Wakefield, 190 N.J. 397, 451 (2007) (quoting State v. Martini, 131 N.J. 176, 255 (1993)). Thus, we defer to a trial court's evidentiary ruling absent an abuse of that discretion. State v. Garcia, 245 N.J. 412, 430 (2021). We do not reverse a trial court's evidentiary ruling "unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)) (internal quotation marks omitted). However, not every "mistaken" ruling warrants a new trial. Ibid. "Only those that have the clear capacity to cause an unjust result will do so." Ibid.

20

We are not convinced by plaintiffs' argument the law-of-the-case doctrine barred the admission of the police opinions.  That doctrine "sometimes requires a decision of law made in a particular case to be respected by all other lower or equal courts during the pendency of that case."  State v. Reldan, 100 N.J. 187, 203 (1985).  "A hallmark of the law of the case doctrine is its discretionary nature[.]"  Lombardi v. Masso, 207 N.J. 517, 538 (2011) (quoting Hart v. City of Jersey City, 308 N.J. Super. 487, 498 (App. Div. 1998)).  The doctrine "call[s] upon the deciding judge to balance the value of judicial deference" for prior rulings "against those factors that bear on the pursuit of justice and, particularly, the search for truth."  Id. at 538-39 (quoting Hart, 308 N.J. Super. at 498) (internal quotation marks omitted).

Our affirmance of the trial court's decision to bar as lay opinions DeMiceli's and Meglio's testimony about their views of the incident does not preclude admission of that evidence for other purposes.  N.J.R.E. 105 provides that evidence inadmissible for one purpose may be admitted for another purpose provided "the court, upon request, . . . restrict[s] the evidence to its proper scope and shall instruct the jury accordingly."  Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 320 (2006) ("Because the evidence here was admissible for some purposes but not for others, to the extent that it is admitted on remand, a detailed

21

instruction regarding the jury's permitted and non-permitted uses of it should be given upon [the party's] request.").  Lowe's sought to admit the officers' opinions for another purpose:  to attack the credibility of plaintiffs' expert witness.

Under N.J.R.E. 607, any party may "introduce extrinsic evidence relevant to the issue of credibility" to "attack[] or support[] the credibility of a witness."  Thus, "[a]ny witness 'may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony.'"  Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (quoting State v. Silva, 131 N.J. 438, 445 (1993)).  "[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion."  Wakefield, 190 N.J. at 452 (quoting Martini, 131 N.J. at 259).

Plaintiffs contend the officers' opinions did not constitute "valid impeachment material" because Balian was "testifying about retail store policies and procedures, not about what occurred between [Tymiv] and Hassan" and because their probative value was outweighed by the risk of undue prejudice under N.J.R.E. 403.  The problem with that argument is that plaintiffs' counsel did not limit his questioning of Balian to his opinions about retail-store policies and procedures.  During his direct examination, after Balian testified he had been asked "to evaluate the incident" and had reviewed "police depositions" as

part of that evaluation, plaintiffs' counsel asked Balian, "based upon your review of the materials in this case, what is your understanding of what happened in this case?" Balian responded: "Well there was an altercation with Mr. Hassan, Mr. Tymiv regarding buying grout. And some questions were asked and some understandings were thrown back and forth, and from what I read, this bag of grout flew up in the air and that's the extent of it."

In stating "this bag of grout flew up in the air," Balian was parroting Tymiv's testimony about the incident. Although Balian acknowledged "[t]here were different accounts," he clearly had adopted Tymiv's version and expressed that opinion when he responded to plaintiffs' counsel's question "what happened in this case" by saying the "bag of grout flew up in the air." By asking for Balian's opinion about "what happened in this case," plaintiffs' counsel opened the door to defense counsel's cross-examination of that opinion and use of the materials Balian had reviewed, including "police depositions," in forming his evaluation of the case.

Moreover, any possible error in the admission of the evidence was harmless because before Balian's testimony, plaintiffs repeatedly exposed the jury to evidence that DeMiceli and Meglio did not believe Tymiv's initial statement to them on the day of the incident. The jury was informed of the

23

officers' opinions when plaintiffs' counsel played portions of the bodycam video during Tymiv's direct testimony. For example, the jury heard DeMiceli heatedly ask Tymiv why Hassan had grout on his back and heard Tymiv accuse the officers of claiming he had committed assault. Tymiv then testified that the officers "ke[pt] telling [him]" that he had thrown the bag of grout at Hassan, they had accused him of assault, and Oganov told him he thought they might be arrested. Plaintiffs' counsel also played the bodycam footage of the interviews of Tymiv during other witnesses' testimony. For example, he showed footage to Hassan's supervisor, Madden, who had been present during the police interviews with Tymiv and Hassan, and asked him to "characterize the demeanor of the police" when they questioned Tymiv. Madden testified the officers had been "[v]ery tense, aggressive, and accusatory" with Tymiv after they heard Hassan's version of events.

Additionally, during his direct examination of DeMiceli, plaintiffs' counsel asked the officer if it was his "job to determine who's telling the truth and who's lying" when he encountered "two people saying exactly opposite things of what happened." The judge sua sponte stopped counsel from "head[ing] down a road to ask him who [did he] believe." Following that sidebar discussion, the court instructed the jury:

A-1830-22

> I want to strike those questions about believability. Only you are in the position to decide who to believe in this case. Any suggestion that the officer, with all due respect, has any opinion or any belief as to who he believes or doesn't believe, that's not relevant. You decide who's t[o] be believed and not to be believed.

Based on this record and considering that instruction as well as the additional instruction the court, with plaintiffs' counsel's agreement, included in the jury charge, we perceive no abuse of discretion or mistaken evidentiary ruling having the "clear capacity to cause an unjust result." Garcia, 235 N.J. at 430.

In arguing against the admission of Sahr's evidence during the liability phase of the trial, plaintiffs' counsel assured the court Tymiv would not testify he was unable to work because of the injury he allegedly had sustained in the incident. Counsel told the court, "after he leaves Lowe's that day, the story ends." But, in fact, on direct examination, plaintiffs' counsel asked Tymiv what had happened after the incident with the work he was supposed to do at Oganov's house. Tymiv testified not everything had been "finished" and that Oksana, not Tymiv, had "coordinate[d] with the workers and . . . she was actually doing [the work]." Plaintiff informed the jury, through his testimony and presentation of the bodycam footage, that after the incident, he had felt dizzy and nauseous and had a shooting pain in his arm, police had called for an ambulance, he was taken to the hospital from the store, and he later had emergency surgery at the hospital.

Because Tymiv did not limit his testimony in the liability phase to liability issues, we perceive no abuse of discretion in the trial court's decision to allow Lowe's to use Sahr's evidence to attack his credibility.

B.

"We review whether the jury was adequately instructed on the law de novo, affording no deference to the trial judge's interpretive legal conclusions." Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 74 (2024). Proper jury instructions are essential for a fair trial. Id. at 74-75. A trial court "must explain 'the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case.'" Id. at 75 (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). It must "correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them." Ibid. (quoting Prioleau v. Kentucky Fried Chicken, Inc., 223 N.J. 245, 256-57 (2015)).

"Not every improper jury charge warrants correction." Ibid. We do not remand for a new trial if the "erroneous jury instruction . . . was incapable of producing an unjust result or prejudicing substantial rights." Ibid. (quoting Prioleau, 223 N.J. at 257) (internal quotation marks omitted). "[W]e will reverse

and order a new trial only when 'the jury could have come to a different result had it been correctly instructed.'" Ibid. (quoting Viscik, 173 N.J. at 18). "And in construing a jury charge, we examine it 'as a whole, rather than focus on individual errors in isolation' by considering 'the language surrounding an alleged error in order to determine its true effect.'" Ibid. (quoting Viscik, 173 N.J. at 18).

Plaintiffs argue the court erred in the vicarious-liability charge by (1) instructing the jury it could find Lowe's vicariously liable for Hassan's conduct only if Hassan "acted negligently in self-defense while in the scope of his duties" and (2) using the phrase "intentional or wrongful" to describe Hassan's conduct in the instruction, instead of the phrase "aggressive or misguided." Plaintiffs also contend the court improperly instructed the jury it could find Lowe's vicariously liable for Hassan's negligence or directly liable for its negligent supervision and training of Hassan, but not both. Finally, plaintiffs assert the court erred by declining to include in its charge an instruction based on section 317 of the Restatement (Second) of Torts.

Plaintiffs do not challenge the court's instructions on Hassan's negligence. They also do not challenge the court's use of three verdict sheets, the decision to have the jury decide first the scope-of-employment question, or the language

on the verdict sheets of the only two questions the jury decided. In fact, the transcript of the charge conference shows plaintiffs had submitted three verdict sheets, agreed with the decision to have the scope-of-employment question as the "Initial Question," and had submitted the language the court ultimately used in asking the jury about whether Hassan was acting in the scope of his employment and whether he had been negligent.

Viewing the charge as a whole, as we must, we conclude any error by the trial court in its instructions regarding vicarious liability was harmless. Plaintiffs complain that "even if the jury believed [Tymiv's] version of the events, and even if they believed that Hassan was acting within the scope of his employment at the time, [it] could not have ruled in plaintiff[s'] favor on respondeat superior with these instructions . . . ." But the jury concluded Hassan was <u>not</u> acting within the scope of his employment when the altercation with Tymiv occurred. And although the court gave the jury an instruction on vicarious liability, the jury was not asked a question on any of the verdict sheets about vicarious liability. The jury was told under what circumstances Lowe's would be deemed negligent for Hassan's action, but it was not asked to decide the issue of vicarious liability. Because the jury did not have an opportunity or reason to apply the vicarious-liability instruction, the instruction did not have

28

the capacity to bring about an unjust result. Thus, any error in that instruction was harmless. See Comprehensive Neurosurgical, 257 N.J. at 75.

Any error in an instruction the jury could find Lowe's vicariously liable for Hassan's negligence or directly liable for its negligent supervision and training of Hassan, but not both, was equally harmless. Plaintiffs argue "[t]he jury was entitled to believe that Hassan was acting within the scope of his employment AND Lowe's was negligent in its training and supervision of Hassan." But the jury concluded Hassan was not acting within the scope of his employment, and it found Hassan was not negligent. Lowe's vicarious liability for Hassan's alleged negligence and its direct liability for its alleged negligent supervision and training of Hassan were premised on Hassan's negligence. The first question on the "Outside the Scope of Employment" verdict sheet and the first question on the "Within the Scope of Employment" verdict sheet used plaintiffs' requested language and were the same: "Was defendant, Ahmed Hassan, negligent during his physical encounter with plaintiff, Ivan Tymiv?" The jury answered no to that question. And with that answer, Lowe's could be neither vicariously nor directly liable.

In addition, we perceive no substantive difference between the phrases "intentional or wrongful" and "aggressive or misguided" in the context of this

case.  See Davis v. Devereux Founds., 209 N.J. 269, 303 (2012) (referencing an employee's "aggressive and misguided" conduct); Vosough v. Kierce, 437 N.J. Super. 218, 235 (App. Div. 2014) (referencing an employee's "intentional wrongful acts"); see also Tymiv, slip op. at 22 (citing Davis, 209 N.J. at 303; Vosough, 437 N.J. Super. at 235).

We reject plaintiffs' argument the court erred by not including in its charge an instruction based on section 317 of Restatement (Second) of Torts.  Section 317 states in pertinent part:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them if
>
> (a) the servant
>
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant . . . and
>
> (b) the master
>
> > (i) knows or has reason to know that he has the ability to control his servant, and
>
> > (ii) knows or should know of the necessity and opportunity for exercising such control.

The Model Jury Charge on negligent hiring, which also addresses negligent retention and supervision, does not reference section 317 or use its language. Model Jury Charges (Civil), 5.76, "Negligent Hiring" (rev. Nov. 2022). See also G.A.-H. v. K.G.G., 238 N.J. 401, 416 (2019) ("To be found liable for negligent supervision or training, the plaintiff must satisfy what is essentially the same standard [as negligent hiring], but framed in terms of supervision or training."). The trial court followed that model instruction in its charge, tailoring it appropriately to the evidence presented. A "presumption of propriety . . . attaches to a trial court's reliance on the model jury charge." Est. of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 596 (2015); see also State v. Amang, 481 N.J. Super. 355, 409 (App. Div.) (finding "[a] jury charge is presumed to be proper when it tracks the model jury charge verbatim"), petition for certif. filed, No. 090633 (June 6, 2025).

Moreover, the record does not support the use of an instruction based on section 317. A finding of liability under section 317 requires that the "master" knew or should have known of a necessity to control the "servant" to prevent the servant from "intentionally harming others" or creating a risk of harm to them. Restatement (Second) of Torts § 317. The record is devoid of evidence Hassan had previously engaged in any harmful conduct such that Lowe's was on notice

31

it was necessary to "control" him to prevent future harm. This case stands in contrast to cases in which section 317 imposed a duty on an employer because evidence established the employer knew its employee had engaged in dangerous behavior in the past. See, e.g., Doe v. XYC Corp., 382 N.J. Super. 122, 139-43 (App. Div. 2005) (citing section 317, court reverses summary judgment granted in favor of employer because employer was on notice employee had been using his work computer to view child pornography, creating a duty for employer to stop him from harming others through similar use of the computer in the future).

## C.

Plaintiffs argue the court erred in two respects regarding counsel's summations: in allowing counsel for Lowe's to mention plaintiffs were not suing Hassan for assault and battery and in not allowing plaintiffs' counsel to comment on Hassan's physical absence from the trial. Both arguments are without merit.

When reviewing a trial court's decision regarding the scope of a summation, we generally apply an abuse-of-discretion standard. See Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 392-93 (2009). However, if the party challenging comments made during a summation did not object to those comments at trial, we consider the challenge to the language at issue under the plain-error standard of review. See R. 2:10-1; State v. Daniels, 182 N.J. 80, 95

(2004); State v. Lora, 465 N.J. Super. 477, 490 (App. Div. 2020). "Under that standard, a reviewing court must 'disregard any alleged error unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Bragg, 260 N.J. 387, 404 (2025) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)) (internal quotation marks omitted). "Reversal is justified only when the error was 'sufficient to raise a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (omission in original) (quoting Funderburg, 225 N.J. at 79) (internal quotation marks omitted).

Before opening statements, plaintiffs moved in limine to bar evidence of the dismissal of the battery claim against Hassan. The court granted the motion in part, barring specific mention of the dismissal of the battery claim but allowing Lowe's to argue that plaintiffs were "only bringing a negligence claim."

Prior to summation, counsel for Lowe's sought clarification of the court's ruling. Counsel confirmed he could not "talk about the fact that the battery claim was dismissed" but suggested he was permitted to say plaintiffs were "not seeking to recover on [an] assault and battery claim because it's not in the charge, only the negligence claim." The court replied, "Right." Plaintiffs did not object.

In closing, counsel for Lowe's stated:

> You may be surprised—you may have been surprised to learn that the plaintiff in this case is not alleging an assault and battery. We have had all this testimony, right? All this back and forth about who punched who, and who caused the fight. And the plaintiff isn't seeking to recover for an assault and battery by Mr. Hassan. What he's seeking to recover is negligence, right? Acting unreasonably.

Hassan's counsel also stated in summation that Tymiv "does not have a claim for assault and battery. His claim is only negligence." Plaintiffs did not object to either of defense counsel's statements when they occurred.

In making those comments, counsel stayed within the trial court's directive, accurately described plaintiffs' claims, and did not compare negligence with assault and battery. The trial court did not commit plain error in permitting that limited commentary.

Before trial, plaintiffs served on Hassan's counsel notices to produce Hassan to testify at trial. On the first day of trial, Hassan's counsel advised the court and counsel he had been "unable to locate Mr. Hassan" despite hiring an investigator to "track him down." In response, plaintiffs' counsel asked to be able to play for the jury the recording of Hassan's deposition and asked the court to give an adverse-inference charge. See Model Jury Charges (Civil), 1.18, "Witness – Failure of a Party to Produce; Adverse Inference" (rev. Oct. 2016).

34

Counsel repeated the request for the adverse-inference charge during the charge conference. The trial court declined to give the charge. The following colloquy ensued:

> [Plaintiffs' counsel]: But I can comment on it in my closing.
>
> THE COURT: What, on his absence?
>
> [Plaintiffs' counsel]: That he failed to appear.
>
> THE COURT: No. He's not required –
>
> [Plaintiffs' counsel]: There's a big difference between me commenting on it in my closing and Your Honor putting Your Honor's stamp of approval on it. So I think that I should be able to at least reference the fact that he knew about this case, he didn't show up.
>
> [Hassan's counsel]: That's an attempt to backdoor the adverse inference, Judge.
>
> THE COURT: Right. That's what that is. You want them to draw an adverse inference because he didn't come.
>
> [Plaintiffs' counsel]: Right, but it wouldn't be coming from you.
>
> THE COURT: Parties are not required to be here.
>
> [Plaintiffs' counsel]: Well it wouldn't be coming from you; it would be coming from me. I'm much lower on the totem pole tha[n] you are.

 A-1830-22

THE COURT: But it's still wrong. I mean you want to say that and then me interrupt your closing to say that that's an improper closing argument? No.

[Plaintiffs' counsel]: No, if you're telling me I can't do it, I'm not going to do it.

THE COURT: You can't do it.

As plaintiffs' counsel confirmed during oral argument before this court, plaintiffs are not appealing the denial of the request to give the adverse-inference charge. They appeal only the decision to preclude their counsel from commenting on Hassan's non-appearance at trial.

Plaintiffs played at trial the recording of Hassan's deposition and have not identified how they were prejudiced by his non-appearance. See Torres v. Pabon, 225 N.J. 167, 183 (2016) (finding trial court had erred in giving an adverse-inference charge when the "plaintiff's counsel had deposed [the defendant] and was fully familiar with his testimony" and had used the defendant's "detailed deposition testimony in [the plaintiff's] case"). In fact, the court gave an adverse-inference charge regarding an incident-report form Hassan testified he had had submitted to Lowe's that Lowe's failed to produce in discovery. On that record, we perceive no abuse of discretion in the court's decision to preclude plaintiffs' counsel from commenting on Hassan's non-appearance.

36

III.

Unpersuaded by plaintiffs' arguments, we affirm the February 8, 2023 dismissal order.  Because we affirm that order, we do not reach the arguments raised by Lowe's in its cross-appeal.

To the extent we have not expressly addressed any other arguments, we have considered them and conclude they are without sufficient merit to warrant discussion in this opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division